First case of the day, which is United States of America v. Joseph S. Antonucci. First we'll hear from Mr. Millett. How are you, sir? Good morning, Your Honor, and may it please this honorable court, I am Edward Millett, and I represent Joseph Antonucci, who is here on appeal after pleading guilty without a plea agreement to counts of mail fraud, money laundering, and making a false statement to a federal officer, that being that he would give up his salary to save the company. I will say five minutes for rebuttal. Some significant dates in the case are that he pled guilty on August 23rd, and the pre-sentence investigation was finished on December 17. On March 4th, he filed his objections to the PSI and complained in them that he had needed additional information on which to determine the grounds for the objections. The addendum to the PSI was filed on March 26th, four or five days before sentencing. The government sentencing memorandum the night before sentencing, and he was sentenced on March 31st. He is before the court appealing, claiming that he ought to be entitled to a re-sentencing. In the sentencing recommendation submitted by the probation office, both the prison time and the amount in restitution, and ultimately the forfeiture amount, were linked as considerations in setting the prison time. The government recognized that, and the night before sentencing, replied to the defense sentencing recommendations. So we are here complaining that all aspects of the sentence ought to be reversed, and the case sent back for a full re-sentencing in the trial court. Now, what is the standard of review that we use in looking at this? There was a big list of all sorts of use of the credit card, and maybe some apply and some don't. How do we review such a huge list of expenses and decide which ones maybe were losses and which ones were maybe legitimate expenses? Certainly, I would not think it's the duty of the Court of Appeals to go through a record line by line and do its own accounting. What happened here was the public defender representing Mr. Antonucci complained that he did not know before he got the pre-sentence report what numbers would be used for restitution, and he wanted to know where they got the numbers that they were relying on in that report. Then in the addendum, he received an answer. In the addendum, it is stated that they relied on materials provided by the government and by an audit by the company. It was developed in testimony at the sentencing hearing that the company never did an audit so that the report writer was misled by the facts when the report writer in the addendum stated there had been an audit. As to the numbers that were used, what Mr. Antonucci saw in the discovery provided was a chart showing $3,061,000 in cents in loss, and then in a pre-sentence report, a number 2,918,261. He asked to learn where the probation office got the numbers they were using. He complained at sentencing that he never got any response to that until the night before the sentencing. At the sentencing, the judge said, well, we may be committing reversible error if we don't give you more time. All he asked for was time. He objected in saying on his objections to the pre-sentence report that on page 1 alone of the 53 pages of lines, on page 1 alone, he identified 53 specific items that were on their face, appeared to be legitimate travel and entertainment. All he asked for was that he have the opportunity to write and examine the numbers now that he had some idea what numbers the government was relying on. They took two recesses during the day, and he commented before the first recess that the government had referred to an FBI 302 report that he didn't even have. He commented that all he wanted was an opportunity to write. He said, now that I know what numbers they're using, they may or may not support the law's finding. I don't know, but on behalf of Mr. Antonucci, our objection is that we have been denied an opportunity to write and consider. So the defense at sentencing was seeking to take on and carry its burden of proof to show what amounts were correct and not materially wrong and supported by external evidence. That was the relief that the court said might be error to refuse, but the government ultimately persuaded the court to refuse. Is there information you need now? Do you have everything you need, or is there something else you need to go through line by line and say in or out? I did not represent him in the trial court, and I did take on the case after he was sentenced, and I took a line by line quickly through the exhibit that they had finally agreed was going to be the basis. I found a consulting fee paid to the head of the company, charged as theft by Mr. Antonucci. I found that sometimes when he took money out of the bank, he redeposited it back into the bank. So I'm not ready today to give you the figure, but the public defender said at sentencing, we believe that with an opportunity, the true figure would be $700,000 to $1 million, and under the 1B1 guidelines, that would be an eight-level reduction and a corresponding reduction in the amount of prison time and the restitution owed. That's my question. What additional information, if any, is necessary for that calculation to be made? My expectation is that if I could get the full files of the public defender's office in a reasonable amount of time, then we could make that calculation and offer it to the court. Get the files from whom? From the federal defender's office who represented him in the trial court. Why don't you have access to that already? I probably do have access to it already. We did make a showing in a post-trial motion for a relief-pending appeal in which we set out the examples I mentioned just a minute ago to indicate to the court that the appeal was not frivolous and was substantial, for if the defense had additional time to study the materials produced late, then they could show that the— I mean, if you could show us in your briefing or today that there's a concrete number that would make a difference. Usually we require someone to say on appeal that you can actually show us harm, that if we send it back, the number would actually make a difference in the guideline level. We can't just speculate that it might. I would answer that the concrete offer proffered to the trial court by the public defender is in the record at $700,000 to $1 million. I have not understood that it was my duty to actually do an accounting de novo  Well, I mean, we just have to have something that leads us to believe that it will make a difference, not just speculation. Well, it is a material difference. In fact, the government conceded that they might give up $100,000 to $200,000, and the court made the finding both on restitution and punishment saying, well, I'm not convinced today now that you've shown me that there's $400,000 wrong, but the opinions of this court consistently say that when there's a restitution involved, the amount needs to be proved fairly specifically. I thought we were talking about guidelines, not the restitution. I thought we were talking about the sentencing range, the imprisonment range. The court used the same figure and the same process for both. I thought they were different numbers. No, they used the same numbers. And the pre-sentence recommendation report, which is a part of the record, says we take into consideration the loss and the prior conduct of the defendant and the facts of the case in making the following recommendation. Sixty months in prison, somewhat we're in the middle of the guidelines, and a restitution figure of X. So they considered them both as though it were a unit of fact to be decided on. So is it a matter of the public defender not having had sufficient time to fully object to the amount? I mean, we don't know what is the correct amount, and it doesn't seem like there was a proper objection that we can review and say the judge was wrong in the figure. The public offender just said, look at the first page. There are some problems here, but didn't go into details to show the court which were the inappropriate amounts. So what are we to do? Did the public defender waive these objections by not bringing them to the court's attention? Are you saying that the public defender didn't have an opportunity to review these figures enough to make a proper objection? He clearly did not waive the objection. He asked for time. The trial court said if I don't give him more time, it may be a reversible error. At the end, he even said, even now, I believe they're showing me records for the first time today. So in effect, he said, I'm not ready because they haven't given me all the material. And then the judge took another recess, and the government lawyer said, Your Honor, he stands by his objections, and we'd like to put Mr. Suchard on. And what they came with from the night before was a new theory, the new theory being that because there were not expense reimbursement forms, everything charged on a credit card or debit card was fraud, and that was the greatest portion of the expenditures. Now, that theory didn't exist until the night before sentencing. It's not in a written policy of the government anywhere. Keep in mind that as a chief executive officer, the person approving these imaginary expense reports would be Mr. Antonucci approving his own expense reports. And while I think they probably should be kept in the running of a good company, this concept came out of thin air in the hours before sentencing in the late memorandum filed by the government. Then Ms. Sebring, in preparing the exhibit, which was the primary chart that you have in your record excerpts, said, I looked at them, and if I didn't recognize a company, I looked it up in Google, and I put that a purchase at Office Depot was not a legitimate office expense because I felt that way. And then the only corroboration she claims she had was that she talked to Mr. Suchard, who assured her that all expenditures were fraud because there were no expense reports. This court has been very clear, and the trial court was clear, that a failure to follow a procedure does not establish a loss amount. The trial judge said we're not going to find the restitution number based on a violation of procedure. It must be actual loss. And that is what the prior decisions of this court say, that when you're getting to restitution, you should be fairly specific, and the court should make an estimate of a loss amount for purposes of restitution. But that was not done here. The sentencing guidelines, there had to be almost a $2 million discrepancy to get to the lower guidelines, and what we have in the record is here's this expense and this expense and this expense, and gosh, these are wrong, so there might be other errors in there, which amounted to only about $100,000, which is not nearly close enough to get you to a lower guideline, so how is this court supposed to handle that where there is nothing in the record that shows there was a significant discrepancy in the amount that the court accepted? These answers, in this particular case, for a guideline, the figure is $400,000, not $2 million. Second, the government offered to concede $100,000 to $200,000. Third, the $400,000 excess figure or $100,000 and $200,000 excess figure was a factor in guiding the probation officer to its recommendation according to the plain language of its recommendation. Finally, the public defender saying they didn't give me all the materials until today. In fact, it's in the record where he says, I don't know that I have all the materials that probation has. They're showing me some new things right now. Fairness requires time. Now, this is not a case where anyone's been dilatory. It's a plea to the indictment. There's no long postponements. There's no harm to be done. So if this case is remanded, what takes place? What takes place is— Is it the burden on Mr. Antonucci's counsel to point out all the errors in the calculation? Does the judge refer it back to the probation officer recalculation? Specifically, how are we going to figure out what the correct amount should be? To take it quite seriously, I think it's the job of the lawyers to be lawyers and the judge to make a judicial decision. In United States v. Leon, one of the many cases that are cited in the brief, this court wrote that even though the Mandatory Victims Restitution Act puts the burden on the government to demonstrate the amount of a victim's loss, a sentencing court may shift the burden of demonstrating such matters as the court deems appropriate to the party designated by the court as justice requires. So I think this is an opportunity for the judge to be a judge, to tell the lawyers what he expects them to do, and have a proper hearing. I guess here's my question. Your client, I assume, could have access to this and has had some time on his hands to look through it. Has he come up and said, here's my calculation. These were my expenses. These are the ones I turned in, and I can tell you this is legitimate. I mean, what's that number? His calculation is $702 million, and there's a gray area— Your client's calculation? That is the estimate that I have from the federal defender and from informal conversation, but it's not of record. I mean, has your client since that hearing gone back and said— He's been in the federal penitentiary since shortly following that hearing. I thought people had access to their records to look through their records. The point in doing a full accounting is, of course, to follow the dictates of the De Leon decision that I was just reading from, that's cited in the briefs, to prepare to present a case to a court. It's not something that I would expect a person who's going up and down the halls of a federal penitentiary to have a convenient place, time, and reason to do. You can't meet with him to go through the records? I certainly will do that, Your Honor, and I'm hoping this court will give me that opportunity. Thank you, Mr. Millett. Ms. Oppenheimer. May it please the court. The issue before this court is whether the district court abused its discretion in determining the loss amount for purposes of the 18-level enhancement under 2B1.1B1J and for restitution. So is that the standard abuse of discretion that would apply here as to whether that figure was . . . For the factional determination, it would be clear error. For the loss determination, it would be whether he abused his discretion in concluding that the loss amount was within the threshold amount for the guidelines. To answer, before I get into the argument, I would like to clarify one thing that's in my brief in response to Judge Owen's question. In our brief, we said that there was a discrepancy between the loss amount that was in the precedence report, the total loss amount that was found by the probation officer, and the expenses listed in financial analyst Sebring's report. Actually, there is no discrepancy. The only discrepancy was contained . . . the $3 million was contained on her list of yearly expenses, and her list included the 2006 expenses, which were outside the temporal scope of his embezzlement scheme. So when the actual 54-page report itself only included the 2007 to 2012 expenses paid by Antonucci for using Patriot funds for his own purposes, when you total the loss expenses for the 2007 through 2000 years, the amount of expenses found by Sebring actually equal the loss determination made by the probation officer. With that said, I need to bring to the Court's attention that the MVRA limits restitution to actual loss directly and proximately caused by the offense of conviction, including . . . included in Sebring's expense report are six line item entries that were designated under the category of cash but under the transaction code deposits. So for purposes of determining whether these are the $70,900 are actual loss to Patriot, that's a determination that should be made by the District Court. Are you saying we have to remand? Is that what you're telling us? For that one limited purpose, for the loss amount determination made by the District Court for the sentencing guideline enhancement and the remaining loss calculated by the probation officer for purposes of restitution, that those are fully supported by the factual determinations or fully supported by the . . . have a full evidentiary basis in the record. It's only those six line item deposit entries that the determination whether they are on Sebring's expense report, they are designated as using the category . . . That is true. Are we talking about just the first page? I mean, didn't we . . . I thought there was some situation where he didn't go through the whole thing, but the public defender says there's all sorts of issues and problems here, and here are some on the first page alone that I think should not be counted. That is . . . It appears that there's some other calculations there that the public defender had some concerns with. The question that you asked, I think, is the appropriate question. How did Sebring determine which expenses were personal expenses and which expenses were legitimate business expenses? And, she testified at trial, at sentencing, as to her methodology for creating the report, and if I could just go through this. Looking at it, what she did was she . . . her report reflects a well thought out and precise message method, excuse me, for distinguishing and separating out the unauthorized transfer and withdrawals of Patriot funds for its own purposes from the legitimate business expenses. What she did was she conducted a forensic analysis of the Patriot bank accounts and Antonucci's personal bank accounts in his American Express records. And, in that process, what she . . . her process involved coordinating with the case agent and the intelligent analyst. She testified that this was about a six month process. In that . . . well, she also testified that she had obtained and reviewed the records from Schuchert, who was the managing partner of Eagle Stone. My point, if you say we're going to have to . . . there's some discrepancy that the district court's going to have to resolve, it seems to me we have to vacate and remand. We don't vacate as soon as it's piecemeal. So, what's there left to talk about? Are we talking . . . if we're talking about this is only for purpose of the restitution for the . . . Okay, so . . . And, if you take out the $70,900 from the $2,000 . . . $2.9 million, you are still way above the threshold amount. So, the question . . . going back to the question is . . . is that . . . did the district court reasonably infer that the expenses listed on her . . . her . . . her report were unauthorized transactions and represented loss to Patriot? As I said, Sebring testified that she had obtained and reviewed the records from Schuchert and . . . Did the public defender have sufficient time or when did they get this report and these calculations? Did they get them in time to review them and make a proper objection? The record reflects that they got the . . . they got the . . . her report . . . her report of expenses paid by Antonucci from Patriot Funds a year before sentencing. They had it for over a year. We had an open . . . basically an open . . . What . . . what . . . what did that report show amount wise? I'm sorry. What were the amounts in that report? The amounts in the report were the 2.9 million calculated by the probation officer for the years within the temporal scope of the . . . I thought you said . . . I'm confused. I thought you said they got Sebring's report a year before sentencing. Sebring's report was . . . was prepared a year before sentencing. It was a . . . a . . . an investigative report that was done. They got it during the discovery process. So they had it for a year. Bottom line said the loss amount is 2.9 million? It says that the . . . it was an expense report. It said that the expenses paid from . . . by Antonucci from the Patriot Bank accounts was the 2.9 million at the . . . Did I answer your question? Let's just be as clear as possible. He knew . . . he was given and told the government is contending that the loss amount is 2.9 million dollars. He knew that for one year before sentencing, and he had the backup information as to how you got that number one year before sentencing. Yes or no? He had the backup information. Now, the question is did he know that we were going to say that this is loss for purpose of restitution? What did . . . or sentencing range. When did he know what the government's contention was about the loss amount and the restitution amount and what the backup for it was? When he got the PSR. And that was the night before the hearing? No. The PSR was given to him probably a month before. And it included Sebring's . . . No. Whatever, her calculations and all that? What it included was the loss determination made by the probation officer. The probation officer apprised him five days before sentencing in the PSR addendum that the factual basis, the evidentiary basis for the loss calculation was Sebring's 54-page report, which he had that five days before sentencing. He had Sebring's 54-page report for a year? Is that what you're saying? Based on what the prosecutor said at trial. I mean at sentencing. Yes, ma'am. So he didn't . . . did he have it five days before or a year before, the 55-page report that broke it, itemized all the different expenses? He had the report, her expense report, a year before. He had five days before sentencing the probation officer's confirmation that that report was the evidentiary basis for the loss determination that was included in paragraph 15 of the PSR. So at sentencing, the question before the district court was whether Sebring's expense report provided a sufficient evidentiary basis for the $2.9 million found by the probation officer as loss for purpose of the guidelines enhancement and loss for purpose of restitution. What Sebring testified was that she took a very, very conservative approach in preparing this report, that she excluded any and all expenses considered or determined to be legitimate business expenses. She included Judy Diamond Associates and said she thought that was a jewelry store? Well, what happened was is that on cross-examination, the defense, of course, counsel, had the opportunity to question Sebring about any expense item on the 54-page report. What he asked her was, what about Diamond Associates? And she testified that, well, it looks like a jewelry store, essentially, but she tempered that with, you know, it's been a while since I've, I researched through Google to determine what some items were, and it's been a while since I've looked at this. This was one of, and this was one of, and the G7 productivity system and the HBCE expenses that were listed on the first page of the report. These are items that I contacted Mr. Schuchert about. When, you know, I did my initial research to determine what the source was, I would put together a list of five or six at a time, and I would contact him, and we would go over them. And what Schuchert, as a result of that, she would make a determination whether, basically verifying whether it's a legitimate business expense. So she gets his, she contacts him, she gets his input, and then the question becomes, it's, when is the final, what is the final, what is her final assessment? One of the things that she considered was that, is that Patriot, Eaglestone and Patriot had a very strict business policy that you had to submit expense reports for any legitimate business, any legitimate business expenses. Excuse me. Mike. Now, was there a motion for continuance by the public defender saying, I haven't had enough time to review this, I need more time to look it over and make appropriate objections to some of these expenses? At the beginning, at the beginning of the sentencing hearing, what he did was he objected based on, wait a minute, I see $2.9 million in the, as the loss determination made by the probation officer, and I see the $3 million listed on the report. And I want to know, I don't, I need more time to figure out what this discrepancy is. And what the, what Judge Ellison did was say, do you want a hearing? Do you want a hearing? I'll give you time. And the colloquy between defense counsel and the court was that he never requested a hearing, that he thought that the loss determination, the evidentiary basis for the loss determination could be based on Sebring's report. At that point, at one point, going back and forth, what the government did was tell the court that we can put on the agent to verify her method in preparing the report. And so she testified. And at that point, the defense counsel, I mean, the district court afforded the defense counsel basically unlimited, unlimited opportunity on cross-examination to go through any of the line items. And what she did, what defense counsel did was mention only the three line items that were listed in her, his objections. And that was the HBCE and the G, say, the G7 productivity systems. Defense counsel was provided, and Antonucci was provided an unlimited opportunity to go through the report with the agent, I mean, the financial analyst, and did not avail himself of that opportunity. As to what happened after the hearing, at that point, after the testimony was concluded, Antonucci put on no evidence. He had the opportunity to present whatever evidence. I mean, the person who would know what were, the best person to know what were legitimate business expenses and which were not, was Antonucci. And he presented no evidence. He had sufficient opportunity to make, or presented no evidence, presented no witness testimony. If, regarding, I mean, for example, regarding his, Mr. Mallett's argument that there was a line entry, a $9,000 line entry to, from Shukert requesting a consultation fee, that was made for the first time on appeal. That was never presented to the district court. And that argument could have been made to the, those questions could have been asked. And the other thing, one of the other points that I would like to make is that what Judge Ellison did was ask Antonucci personally, you tell me, tell me, give me a number. Tell me what, what, give me a number for the business expenses that you think are legitimate business, I mean, the expenses listed on Sebring's report that you think are legitimate business expenses. And Antonucci's personal response to Judge Ellison was, Your Honor, I honestly don't know. Well, I thought he said affirmatively, I see things on here that were business expenses. And then the court said, well, how, give me a bottom line dollar amount. And then he said, I don't know. But I thought he affirmatively said, I see some things just looking at it that I think were legitimate business expenses. The point is, is that he had the opportunity at sentencing to go through and present evidence and to establish that there were legitimate business expenses, and he did not avail himself of that opportunity. And reiterate what it is that you are conceding needs to be remanded. Only on restitution for the limited, in my view, the limited purpose of determining whether the six line items that were included on Sebring's expense report as deposits were represented actual loss to Patriot based on, as approximately cost by his offensive conviction. So if we're mandated, it's limited to that? It would not open the door to reviewing the whole audit? No, sir. He was provided an extensive opportunity. And why would that be? Because it was waived because they were not properly objected to? So you're limited to only those that you brought to the court's attention? We're looking at the factual determination made by the district court. And our position is that he made a determination that the loss amount sans the $70,900 was fully supported based on evidentiary evidence that we presented at sentencing. But there was evidence that if it was not supported by an expense account report, it was deemed to be improper. There was evidence to testify that the policy was that he had to present expense reports to get reimbursed. And what Sebring testified was is that she requested expense reports from Antonucci and Patriot, and she was provided no expense report to basically contradict her analysis that these expenses were not legitimate business expenses. Thank you. Mr. Millett? I would please the court in brief reply. Judge Ellison is an excellent judge. Everybody in Houston is happy to have a case in Judge Ellison's court. He allows everything to be disclosed in the ordinary situation, and I feel that here he really sentenced preemptively, inconsistently with his general tenor. For example, he allows the sentencing recommendation of probation to be disclosed to the defense. And in this sentencing recommendation, the probation officer balances in both the loss amount, the prior criminal record, and the guideline range in determining to recommend a 60-month sentence and the restitution figure. Judge Ellison adopts in toto the recommendation of the probation office. So we feel this falls within United States v. Beecham, which is cited in the government's brief at 45, where it's unclear that the restitution was not balanced in determining the prison term. And so in the Beecham case, Judge Owen writing, I believe, says that in that case, in that situation, we would reverse for all and offer that in rebuttal to the suggestion that there would be a partial reversal. As to what the defense knew and when it knew it, the record is clear. I'll ask you to be patient with me while I read from the transcript in the district court about all the discovery that he had recovered. The government just put in some exhibits. I had these before, but as I said in my response, it wasn't clear to me these were the things that probation was going off of. It also appears the government has given probation other materials that I do not have. So if the court relies on this, it may well be enough, but I would like an opportunity to respond in writing. That is the objection that is persistent throughout the sentencing. I got the material last night. They've established a new theory with this suture testimony about everything being fraud because there are no expense vouchers. I want time to write in reply. I filed in writing something saying it's not even clear to me what the basis for these losses is because they don't seem to match the chart. And in response, I got nothing identifying the chart. Now they've actually gone to the trouble of putting something in the record. I know what this is. I can actually do that. If I proceed while Mr. Gallagher is claiming he needs more time, I think we are just setting ourselves up for a reversal. I can give you more time. But he didn't get more time, even though after the next recess it was well stated by the government on behalf of the defense that the public defender, Mr. Gallagher, stands by his objection. Also, late, we learned, not that, as stated in the supplement to the probation officer recommendation, that their report was based, their recommendation was based not only on the government chart, the I looked at Google to see if it was a business expense chart, but also during an audit prepared by the company. But in the evidentiary hearing, it is clearly established by the judge's questions of Mr. Suchert, the owner of the company, you didn't, the books were never audited, Mr. Suchert, no sir. So, it is not based on a reliable chart because there was a bad method that we have this $2.9 million. It's $2.9 million in restitution, which you should not have to pay because it hasn't been proved. It's with interest. Under the forfeiture law, he owes a civil and criminal forfeiture for an equal amount. So, Mr. Antonucci is now upside down for $5.9 million plus interest when he is released from prison and has a chance to start his life over. We respectfully ask that the court, in being consistent with the precedence of this court on these economic crimes cases, give Mr. Antonucci a right to make his case. Thank you.